Okay, good morning Mr. Newell. Good morning and may it please the court. My name is Brent Newell. I am joined today by several members of El Comite who have come up from the San Joaquin Valley to watch the argument. I would like to reserve five minutes of my time for rebuttal. Sure. And if you could keep your voice up. Of course. This morning I'd like to emphasize three points. First, the long-standing pesticide volatile organic compound reduction commitment for the San Joaquin Valley is a 20% reduction. Second, the new San Joaquin Valley SIP revision or emissions cap as EPA calls it, is not enforceable. Third, EPA failed to consider important evidence and provide a reasoned judgment. When finding that California provided necessary assurances that the pesticide strategy complies with the Civil Rights Act. First, California committed to a 20% reduction. The Howick Camp letter, in the words of the Warmerdam Court, is, quote, the final word in the saga of the SIP. There's no question that the Howick Camp letter is in the SIP or not in the SIP. It's in the SIP. The plain meaning of the Howick Camp letter is the first sentence says, quote, our commitment is for a 20% reduction from 1990 levels by 2005 in each SIP area except San Diego. The second sentence says, quote, we only took credit in the attainment year. San Joaquin Valley 1999 equals 12%. Sacramento 2005 equals 20%. Ventura 2005 equals 20%. Southeast Desert 2007 equals 20%. South Coast 2010 equals 20%. The first sentence unequivocally says what the commitment is, what the control strategy is. The second sentence refers to the amount of reductions from that control strategy applied to the attainment demonstration for each area in that attainment year. That's why there's this varying degree of years described in the two sentences. The commitment is to get that 20% by 2005, but the other four non-attainment areas have different attainment years. Indeed, South Coast is 2010, Southeast Desert 2007. Where did the 12% come from? Excuse me? Where did the 12% come from? The 12% reflects a linear reduction from the start of the strategy through to 2005. So because San Joaquin Valley was the only air basin that had an attainment year before the 2005 commitment deadline, it could not take credit for the entire 20% of reductions. That's why there's 12%. The plain meaning... Why isn't that valid? Excuse me? Why isn't that valid? Why isn't... valid. Why isn't the 12% valid? Yes. You're trying to hold them to the 20%? That's correct. They say their obligation is 12%. That's correct. Why isn't that right? Because when the court misses that meaning on the plain language of the SIP, when not absurd and not contradicted by EPA's intent, it's 20% because the first sentence says our commitment is 20%. Second sentence says this is how we're going to take credit for those reductions. Now, they couldn't take credit for more than the 12% because of that linear reduction pattern. They would have... they would have been unable to take credit for reductions that were yet to occur because the strategy was linear going from 1994 all the way to 2005. Now, applying that... You're saying they were, quote, better than the other areas, but they should they should drop by 20% even though they, in effect, cleaned up their act somewhat better before you start looking for 20%. Is that where we are? No, no. Actually, their error was cleaner to start with. So Congress said cleaner areas have less time to meet the standard. The dirtier areas have more time. But it's not for us to question the wisdom of what the state did or for EPA to interpret that away because EPA's role is only to approve or disapprove that which the state submits. The state here submitted an unequivocal commitment for each area of 20% by 2005. The court does not defer to EPA's interpretation. Safe Air made that abundantly clear. My second point is that the SIP revision, this new one for the San Joaquin Valley, is not enforceable. This new SIP revision is California's commitment to maintain at least or at least 18.1 tons per day of pesticide volatile organic compounds in the San Joaquin Valley. Under that revision, California commits to adopt any regulations necessary should emissions exceed that 18.1 threshold. EPA determined on remand from the El Comite 1 case and the Air versus EPA case that it need not decide whether the pesticide element was enforceable because California submitted this new SIP revision as well as the fumigant regulations. But all EPA did really was swap the unenforceable pesticide element for a new unenforceable SIP commitment or the SIP revision because the SIP revision does exactly what the pesticide element did. It conditions adoption of regulations and implementation of actual control strategy on the Department of what the inventory is. And in Warmerdam, this court held that citizens could not enforce that inventory calculation methodology. So the SIP revision suffers from the same fatal defect that ended the Warmerdam litigation that rendered that commitment unenforceable. EPA claims, and the only authority that it is part 64 of Title 40 of the Code of Federal Regulations, it says that this means that the inventory is compliance assurance monitoring. But those regulations only apply to individual sources of air pollution like a power plant or a factory or a refinery. EPA is trying to bootstrap that onto this El Comite argued in the Warmerdam case. Warmerdam said El Comite couldn't bootstrap the inventory calculation procedure to the commitment to adopt regulations to make that unenforceable. It specifically rejected that argument. So under Warmerdam, both the SIP revision is unenforceable and the pesticide element is unenforceable. Here, EPA said that this SIP revision helped San Juan get a commitment for the valley. Well, that is arbitrary and capricious because the SIP revision itself is unenforceable. My final point is that EPA failed to consider critical evidence and provide an explanation for when it found that California provided assurances that its pesticide strategy complied with provides that California must demonstrate necessary assurances that its strategy, quote, is not prohibited by any provision of federal or state law. EPA does not dispute that the Civil Rights Act is included in that provision and that California must provide these assurances. In fact, there's record evidence of EPA making that point in the 1990s. EPA's finding that California provided these assurances is arbitrary and capricious because it failed to consider an important aspect of the problem. There are two important aspects that EPA failed to consider. Its discussion in the final rule did not consider or discuss its own finding. I want to emphasize that EPA found just a few months before this final rule that California had been violating the Civil Rights Act's pesticide strategy. EPA did not consider that evidence in the context of what California submitted. Are you referring to the settlement of the lawsuit? Not the settlement, not the settlement. EPA's exposure assessment and disparity analysis where EPA looked at schools in California where pesticides were applied, who attended those schools, and found that the schools with majority Latino students all suffered disparate and adverse impacts. But that was done within the context of that suit? It was done in the context of that civil rights administrative complaint to EPA. And EPA only looked at the data from 1995 to 2001 and only for methyl bromide. So that leads me to the second point that they didn't consider. We provided comments and there's evidence in the record showing that after 2001, methyl bromide use declined dramatically and other fumigants replaced methyl bromide. EPA didn't consider this evidence of the new inventory data, the most recent data, in the context of its exposure assessment and disparity analysis. Footnote 28 of the final ruling says that it's also worthy of note that EPA's knowledge none of the groups that signed the El Comité's rulemaking process. Any comment on that? I think EPA is trying to disparage El Comité's comments, so there's certainly no... It's not a disparage, it's either true or false. I mean, it says none of the groups raised these concerns during the rulemaking process. Well, it is true, Your Honor, but Section 307 of the Clean Air Act does not state that anyone has to exhaust state administrative remedies prior to initiating... Oh, but you're telling us they didn't consider evidence and it looks like at least there was a pause, you know, an absence of a presentation of evidence. See, we're not challenging California's conduct under Title 6 directly. What we are challenging is EPA's duty to ensure that the state provides assurances that its program does comply. So what... Don't they have considerable discretion in that? Undoubtedly, EPA has discretion, but EPA still must articulate a rational connection between the facts it finds and the choice it makes. It must base its decision on the record and it's... Did you come forward with any evidence of a current violation at the time of this final rulemaking? At the time of the final rulemaking, the evidence that we provided was EPA's own analysis and the new inventory data that showed that EPA had not considered that data in the context of whether or not California provided assurances. I don't think you understood my question. Was there evidence of a current violation as of the date of that rulemaking? No. No, but it's not on... The burden of proof in Section 110A2E is not on the public to show that the state is violating the Civil Rights Act. Section 110A2E says that the state, the state has the obligation of providing assurances to EPA that what it's doing is not prohibited by the Civil Rights Act. And we provided evidence, Your Honor, and it's not our burden to make that showing that there is a Title 6 violation because principally, and this wasn't in the briefing, but this responds to your question, the Civil Rights Act doesn't give people the the right to go in and enforce the Civil Rights Act directly. In Alexander v. Sandoval, the Supreme Court held that agencies have the obligation of enforcing the Civil Rights Act. There's no right of action. Let me just tell you what my thought process is and see if I'm just misunderstanding the situation here. We start with the premise that they have considerable discretion in what is or what is not a reasonable assurance. Correct. And then we see that there's no evidence of any current violation and I'm having trouble finding how they would have abused their discretion on that state of affairs. Well, there is evidence that there's new data before the agency, which it did not consider, and the Sierra Club v. EPA case, which involved the EPA's approval of the one-hour ozone plan for the San Joaquin Valley, that considered an identical situation. Not identical in the Section 110A2E, but identical in that EPA found that it need not consider new data going towards the validity of that plan. And the Ninth Circuit said, no, if you're aware of new data that is has an obligation to consider that data. The Ninth Circuit held that EPA's decision to approve that plan when this new inventory data became available was arbitrary and capricious because that had not considered that data. And that's why under Section 110A2E, EPA's actions approving this pesticide strategy was arbitrary and capricious when it did not consider that data. Unless there's any further questions from the Court, I would like to reserve. Thank you, Mr. Newell. Thank you very much. Good morning, and may it please the Court, my name is Dustin Magumfar and I represent the United States. With me here today is Jefferson Whaling from EPA Office of Regional Counsel here at Region 9. I'd like to address three issues that have come to EPA's approval of a revision to the pesticide element of the California State Implementation Plan. First, the 1994 pesticide element is ambiguous and EPA is reasonably interpreting it to mean that California committed to reduce emissions from pesticide use in the San Joaquin Valley by 12% below 1990 levels. EPA's reasonable interpretation is entitled to Second, EPA reasonably determined that it did not need to revisit its earlier approvals of the pesticide element because California has now fulfilled the commitment in the original 1994 pesticide element. Third, EPA reasonably determined that California provided necessary assurances that implementation of the pesticide element would not violate Title VI of the Civil Rights Act, particularly in the absence of any evidence of a current violation. EPA's reasonable and entitled to deference. Accordingly, the petition for review should be denied. Okay, now with respect to the first point on the ambiguity, could you help sort out the various documents that we're supposed to look at? Absolutely. The interpretation of the SIP must be based on what is in the SIP. Relevant to this case, there are two things in the SIP. There's the 1994 ozone plan, and that original plan, which is discussed in some length in our brief, begins at excerpts of record page 106. The second document that is in the SIP is the Boyd-Houkamp letter, which we were discussing earlier this morning. Those are the two documents that are in the SIP. So the interpretation of what the SIP means, whether plain meaning or if it's ambiguous, whether EPA's reasonable, is governed by an interpretation of those two documents. The first document, and let me just add that the safe air decision of this court has said that SIPs are interpreted as federal regulations. So if there's plain meaning, that's certain review, but if the plain meaning is not apparent, then review is under our V. Robbins, under which EPA's interpretation is controlling, unless quote, plainly erroneous or inconsistent with the regulation. Now the 1994 pesticide element, which was part again of California's ozone plan, describes a 20% reduction from VOC emissions from pesticide use in the five air quality areas at issue as a goal and as the maximum reduction. Quote, the plan offers the flexibility to achieve reductions of less than 20%, end quote, if less than that is needed in order to attain the one hour ozone standard. And that's at excerpts of record page 106. Indeed, this court in the Warmer Dam decision stated, quote, the pesticide element set a, quote, goal of reducing by 2005 pesticide related emissions from the 1990 baseline by a, quoting again the pesticide element, maximum of 20%, end quote. There's other places in the plan as well cited to in our brief that describes the pesticide element as setting a goal and a maximum of 20% emission reductions and of being flexible. The purpose of the pesticide element was to help those areas come into attainment with the one hour ozone standard. And so the pesticide element was designed to help get to attainment, and so the emissions needed from pesticide, the emission reductions needed from pesticide use were to support attainment. You can't look at that in the absence of understanding that this was tied to the attainment demonstration and helping to attain that standard. Now there's no dispute that California only took credit for emissions reductions of 13 tons per day in the San Joaquin Valley in 1999, and that is equivalent to a 12% reduction from 1990 levels. So the ambiguity in the SIP is that you have the pesticide element itself, the plan, describing it as flexible, as setting a maximum of 20%, that the 20% reduction is a goal, and you have the Boyd Howe Camp letter clearly stating that the credit taken towards attainment in San Joaquin Valley's attainment year is a 12% reduction. And then you have one sentence in the Boyd Howe Camp letter that Mr. Newell quoted this morning that says the commitment is to a 20% reduction in all five areas. Now this court in Bayview said, quote, our task is to interpret the regulation as a whole in light of the overall statutory and regulatory scheme and not to give force to one phrase in isolation, end quote. As I've discussed, the statutory scheme is to attain and then maintain the applicable air quality standard, which here was the one-hour ozone standard. No subsequent air plan submitted by the state for emission reductions beyond the 12% that were supposed to be achieved to help San Joaquin Valley attain in 1999. The petitioners and their interpretation... When you say take credit, I'm not sure what that means. Yes, let me explain that. So the the NAAQS, the National Ambient Air Quality Standards, sets the maximum level of pollution in the ambient air. For ozone, you're controlling emissions of two substances, volatile organic compounds and oxides of nitrogen, or NOx. States submit state implementation plans which have to include enforceable emission limitations and other control measures, means or techniques pursuant to 7410A2A of the Act. The SIPP must also include an attainment demonstration. And what the attainment demonstration does is it shows by how reductions from those control measures will bring an area into an attainment by the applicable deadline. And they show that by how much emission reductions they expect from each control measure and when it will do it. And as part of EPA's review and approval process, EPA reviews the amount of emission reductions that the state here, California, expects to achieve from each control measure and, if it agrees, approves a credit of that much. So here, what California said was that from the regulation of emissions from pesticides under the pesticide element in San Joaquin Valley, they expected to achieve 13 tons per day of emission reductions of VOC from the pesticide element. And so that's, they took credit for those reductions towards San Joaquin Valley's attainment year in 1999. And so that's why to have the one sentence that says the commitment is to 20% in all five areas, and the very next sentence to say, but we're only taking credit in the attainment year of 1999 for 12%, those are contradictory. And so that is the in itself, the pesticide element. I'm sorry, when it says I'm taking credit for, that means this is what we've done? That means that this is what we expect the pesticide element to achieve. Okay, that's what I'm... Right, exactly. So in 1994, California was saying, we expect, or actually at the date of the Boyd-Houwkamp letter... The goal is 12% and in the other... Well, the pesticide element describes the was, we expect to achieve 13 tons per day of VOC emission reductions in San Joaquin Valley by 1999. And we are applying those achieved, anticipated achieved emission reductions toward our attainment demonstration. So this is how the pesticide element will help the San Joaquin Valley attain the one hour max. And so that's the context of what was happening here. That is the statutory and Boyd-Houwkamp letter that says the commitment is to a 20% reduction in all five areas except San Diego. That is giving force to, as this court in Bayview said, one phrase in isolation. And as support for why this interpretation of plain meaning is reasonable, petitioners look beyond the documents that are actually in the SIP. They look again at the Wells Memorandum, which this court has said is not in the SIP. They look at the proposed rule, which this court in Warmerdam said should not be considered when part of understanding what has happened. If the SIP were truly unambiguous, resort to so many other materials would not be needed. But even if this court believed that petitioners' interpretation were reasonable, if EPA's interpretation is also reasonable, which we submit it is, then that demonstrates that the language is unambiguous and that the plain meaning doesn't demand or support just one interpretation. Let me ask you this. I'm not clear how this works, you know, in real life, the practical consequences of this. If just for the sake of discussion we were to say the 20% really does apply, not the 12%, I'm just, for the sake of argument, what would happen? Does somebody get fined? Does somebody go to jail? What happens? Do they close up the state? I mean, what happens? Yes, we just shut California down. What would happen if this court were to conclude that the SIP unambiguously requires a 20% reduction, then the proper course for this court to take is to remand this action that is before the SIP. There are a number of things there, including whether what California has submitted is sufficient in light of the SIP requiring a 20% reduction, and then EPA will determine what the appropriate next course of action is, and then whatever EPA's decision is will be subject to further judicial review. Which could be what? Sanctions? Sanctions are only a possibility if EPA, there could be a sanctions clock that could be started, depending on different kinds of EPA action that could be taken. EPA could issue a SIP call saying the state needs to submit a revision to the SIP. EPA could disapprove, in whole or in part, part of the SIP approval that was at issue here today. That would establish a sanctions clock. Sanctions won't automatically... When all is said and done, what could happen? Could they lose federal funding, or the governor get fined? If sanctions actually went into effect, I believe there is some risk of loss of federal sanctions, but those would all be down quite a bit down the road, and would only be triggered... You'd probably see those, too. It's entirely possible. But the other important note I want to make about remedy, even if this court does conclude that it unambiguously requires 20%, is that vacature here of EPA's action is not appropriate, and this is why. The approved, the package that was submitted to EPA, that EPA approved, the emission cap, the fumigant regulations, the air quality, by reducing the amount of VOC emissions coming from pesticide use. And so to vacate EPA's action here would remove the ability to enforce, as a matter of federal law, these regulations that have now been approved into the SIP. With respect to remand and EPA's evaluation of the original commitment, Mr. Newell incorrectly stated that EPA did not consider the enforceability of that original commitment, as this court required in its prior actions. EPA did consider the enforceability of the original commitment, and EPA said it does not meet the enforceability requirements of the Act. But what EPA said is, you have an unenforceable commitment in the 1994 SIP to adopt regulations to reduce emissions of VOCs from pesticide use. California has now fulfilled that commitment by submitting regulations into the SIP to do that. The fumigant regulations alone were expected to achieve 1.5 tons per day of emission reductions. The emission cap sets a ceiling on the amount of emissions, and there's a similar regulatory scheme in place for Ventura County as well. So what EPA said is, we don't need to revisit our earlier approval of the 1994 pesticide element, because that commitment has now been fulfilled. And as to fumigants? Well, as to the pesticide element in total, because the pesticide element simply says, at least EPA's interpretation of the ambiguity, you must reduce emissions of VOC by 12% below 1990 levels. These regulations, even though they don't regulate every source of pesticide use in these areas, do achieve, in EPA's scientific and reasoned judgment, the amount of emission reductions that are required. And further, EPA concluded that these regulations are enforceable. Now, the petitioners rely on Warmerdam to say, well, no, what's been approved here is not, in fact, enforceable, because you're trying to bootstrap monitoring into a baseline. But here's the key critical difference between what is at issue here today and the Warmerdam Court. Before the enforceability of the 1990 baseline, the 1990 baseline says, okay, we need to figure out what the emissions of VOCs from pesticide use were in 1990. We have to understand where we're starting from. We have to understand what emissions were at that fixed point in time. That baseline, the district court in Helleker and then this court affirmed, did not control emissions, because it didn't seek to limit emissions. It didn't set a standard for emission limitations. It simply said, this is what it is, exactly. This is what the emissions were at this point in time. The fumigant regulations and the emission cap are a limit on emissions. They say the fumigant regulations impose a number of restrictions on the methods of applying fumigants in these areas, and the emission cap says California will regulate emission use or pesticide use not to exceed 18.1 tons per day of VOC emissions from pesticides. So what is before the court today is, in fact, an emission standard or limitation. Now the reference to Part 64, as EPA said in the final rule, and I must admit was not artfully stated in our brief, is an analogy. As EPA explained in the record, our brief failed to say that it was, as an example, Part 64. We're not saying Part 64 directly applies and is why. Part 64 gives a definition of compliance monitoring, and so EPA's point in the record is that all the record-keeping and the monitoring requirements, the use of the Neal Memorandum, all of those things that are part of the fumigant regulations, considered together with the emission cap, those are all part and parcel of the emission standard or limitation, and that is why they're all enforceable by EPA under Section 7413 and by citizens under 7604. Turning to the question of whether EPA reasonably determined that California provided necessary assurances that implementation of the pesticide element would not violate Title 6 of the Civil Rights Act 1964, there's a couple threshold points here. The Act does not require that California demonstrate or provide a demonstration or do a disparate impact analysis that implementation of the SIP revision will not violate Title 6. The Act says that California must provide necessary assurances, and as the court has already observed, EPA has substantial discretion in determining what constitutes sufficient necessary assurances. And so that decision is entitled to deference. This court has acknowledged that in OBRA and the cases we cite from the First and Second Circuits have observed that EPA... Is their determination that basically unreviewable? No, certainly not. Give me an example of what would be an abuse of discretion when it comes to... Some of the cases that we cited from the First and Second Circuits absolutely provide an example of just that. And I confused them, so let me say. So in NRDC versus EPA, which was the First Circuit case in 1973, there the Massachusetts said in submitting its SIP for approval to EPA, we don't have enough resources to implement this. And EPA approved it anyway. And so what the First Circuit said was, you need to explain how in light of Massachusetts saying we don't have enough resources, EPA nevertheless concluded that Massachusetts provided the necessary assurances. Okay, that's an extreme example. Anything where they've... where they have found necessary assurances that... I don't understand if they say we find it necessary and assuming the state says we're not really gonna make any effort. And the examples that we cite from the First... There are very, very few appellate cases, or other cases I'm aware of, that have discussed what it means to provide necessary assurances under A2E. And most of the cases we cite in our brief have to do with... over had to do with state laws, whether state laws were sufficient to allow implementation of the SIP. The First and Second Circuit cases were about the other element of A2E, which is whether there are sufficient resources. And so the cases that have remanded EPA's decision in light of necessary assurances have all come in the context of a state saying, we don't have enough resources. Or in Friends of the Earth v. should provide the resources. In the absence of that kind of situation, it's basically unreviewable, is what you're saying. Well, I don't think it would necessarily be unreviewable, but I think what the context here is that the evidence before EPA were the... the assurances provided in the Leahy letter by California, which cited to evidence with... which EPA discussed. The statement, the certification of compliance with Title VI, that was filed by the Department of Pesticide Regulation, that said they were complying with the EPR and EPA. And on the other hand, you have submission of evidence that EPA concluded that between 1995 and 2001, that complainants had made a prima facie showing of a violation of the Civil Rights Act. So you have more than a decade old evidence of a violation, versus all of the current evidence in the record, including explicit assurances provided by California, that implementation would not violate Title VI. And the... one of the critical things to recall here is that the pesticide element does not permit or regulate pesticide use per se. It requires... it reduces VOC emissions from pesticide use. It improves air quality. The pesticide element is not why growers are allowed to apply fumigants to their crops in the San Joaquin Valley. So they... implementing the pesticide element reduces VOC emissions. So it has environmental benefits. And so to argue that that somehow is implementing it, violates Title VI, is incongruous. Well, I just... it's a little hard to figure out what's going on with... when in this case. So could you just explain the... at the time that it... that the EPA approved the fumigant regulation, what was the status of this Title VI litigation? So the complaint was filed, the administrative complaint, pursuant to EPA civil rights regulations, was filed in 1999. I don't recall the specific years, but somewhere during the 2000s, the first decade of the 2000s, EPA's Office of Civil Rights commissioned a study that looked at the period of 1995 through 2001 to evaluate whether there was showing of a violation of Title VI. And they concluded, somewhere in the late first decade of the 2000s, that there was a prima facie showing of a violation. And at that point, EPA's Office of Civil Rights entered into settlement negotiations with California's Department of Pesticide Regulation in attempt to resolve the complaint. And that settlement agreement is part of the record. The settlement agreement was concluded and signed and executed in 2011. EPA's decision here, that's under review, was... final notice was promulgated in the Federal Register in late October of 2012. So you have the... there's about a year or so difference between when the settlement agreement came out and when EPA made its final decision. The Leahy letter was in 2012 too, wasn't it? The Leahy letter was in response to EPA during the rulemaking process for this SIP revision. EPA, in response to comments filed by the petitioners on the proposed rule, EPA went to California and said, provide the necessary assurances. You know, explain why implementation of the SIP revision will not violate Title 6 of the Civil Rights Act. And the Leahy letter was California's response. Exactly. So there's timing coordination between the settlement agreement and the decision, but the study period when they... when EPA found a prima facie showing a violation was more than a decade prior. And the record reflected at least four instances of increased regulation on the use of methyl bromide. And that's what's documented in the settlement agreement and all the other evidence. Let me see if Judge Woodridge has any questions. Thank you very much. Thank you very much. Mr. Newell, you get the last word today. Thank you, Your Honor. First, with regard to the standard of review, EPA asserts that our deference is appropriate. That is, the court defers to their standard of review. Mr. Magumfar infers the SAFER court said that our deference would apply if not ambiguous. SAFER doesn't talk about our deference at all. That is, frankly, a misrepresentation of the decision. The standard of review is important when considered in the context of Justice Scalia's dissent in Decker versus Northwest Environmental Defense Center, where he said that providing agencies deference to interpret their own regulations implicates a separation of powers issue, where deferring to the interpretation of those who write the regulations as to whether those regulations have been violated takes away power from the court to decide what the regulations mean. So our position is the court does not defer to EPA's interpretation. It applies a SAFER standard. Judge Schroeder, you asked about the documents in the saga of this SIP, and it was confusing as to what documents, you know, express this plain meaning. And Mr. Magumfar described the 1994 pesticide element, and then he talked about the Howat Camp letter. There's a big gap between those two documents. And evidence in the record shows, and we described this at our opening brief at pages 12 to 16, that once that pesticide element came into EPA, that EPA viewed that and said, this is not adequate. This is ambiguous. This is not going to hold up. This is not enforceable. So they exacted more from California. They exacted commitments. They exacted the Wells memorandum. And through what EPA admits was, may have been inadvertent. It was omitted from the Code of Federal Regulations, and thus the Warmerdam holding. But after Wells came the Howat Camp letter, and that unequivocally says our commitment is 20%. So when you look at the entire evidence in the record here, and this is under the absurd prong of safe air, it would be absurd to hold that the commitment is 12% because of what EPA did to get an enforceable promise in the first place. The Warmerdam language that Mr. Magumfar quoted when he said that, you know, trying to say that the court held the commitment was 12%, and he quoted some language from that decision, that's dicta. Because Warmerdam made a very important distinction. It said we are, our decision is what is in the SIP and what is not in the SIP. And we are not interpreting what the SIP means. So to the extent that Warmerdam talked about 12%, that's dicta. Judge Schroeder, you asked what does take credit mean. And we agree with Mr. Magumfar's description of what that means. And that description really does highlight the differences between the two sentences in the Howell-Camp letter. The first sentence, that's the control strategy. The second sentence is, what are we going to do with the reductions that are achieved from the control strategy? So two separate important functions that happen in the SIP approval process were going on here. And EPA tries to conflate them to create ambiguity and to lower the amount of reductions that San Joaquin Valley residents should enjoy. Judge Silverman, you asked what happens if the court holds 20%. The court can just remand, as Mr. Magumfar suggested. But the court can also remand with direction to vacate. And we suggest the court do that if the court holds 20%. What happens after that is EPA would make a finding that the SIP violates the Clean Air Act because it's, because they've only submitted 12%. They would disapprove it and that would put California on the clock to fixing it. They would have up to 18 months before the first sanction comes in. And then it would be fixed through the process under Section 110-K. There is a big difference on the ground because, and you can see it in the SIP revision, the new SIP revision for the San Joaquin Valley. 1.6 ton per day difference. That's 584 tons per year of volatile organic compounds that should be reduced in the valley and are not being reduced. The last point I have, I have 30 seconds, with respect to Section 110-A-2E. This case presents much more than a garden variety 110-A-2E analysis because there's this important fact that EPA found a Title VI violation in California. Granted, it looked at data that shows the situation has changed on the ground. Methyl bromide was banned and its use went down drastically. And other fumigants replaced it. And EPA didn't consider that shift. The Leahy letter submitted by TPR contained no evidence at all. It was a conclusory letter. I see that I'm out of time. JUSTICE SCALIA This business of the assurance, if I listen to the EPA, all they have to say is, yeah, we'll take care of it. And maybe he's right, but you're suggesting we can look behind the words, we'll take care of it, to see if it was reasonable for the State to say that or if it was irresponsible or something. Because unlike the case they cite where they say, yeah, we can't guarantee it because we don't have the resources, this time they say, yeah, we'll take care of it. And how much can we look behind that assurance to say that's unreasonable? MR. GARRETT I think, Your Honor, that you're evaluating it in a different light, maybe as you would as a trial judge looking at evidence of a Title VI violation. JUSTICE SCALIA I'll take it and I won't be insulted. MR. GARRETT Thank you. But I think the role of the Court here is to determine not what is going on in California, but to determine whether EPA explained its decision and whether it considered important evidence that is part and parcel to that decision. And the Court would come to the inescapable, in my view, conclusion that EPA did not consider important data and its decision is thus arbitrary and capricious. Thank you very much. MR. GARRETT Thank you, Your Honor.
judges: Garbis, Schroeder, Silverman